# ATTACHMENT - 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **KEITH N. DARROW** | * | |
| ~~36 Sandy Ridge Road~~ | | |
| ~~Sterling, Massachusetts 01564~~ | * | |
| **Plaintiff,** | * | |
| v. | * | |
| ~~**AMERICAN SPEECH-LANGUAGE-HEARING ASSOCIATION**~~ | * | |
| ~~10801 Rockville Pike~~ | * | |
| ~~Rockville, Maryland 20852~~ | * | |
| ~~**SERVE:**~~ | ~~**Arlene A. Pietranton, Resident**~~ | |
| ~~**Agent**~~**AMERICAN SPEECH-LANGUAGE-HEARING ASSOCIATION, et al.** | * | **Civil Action No.: 8:26-cv-00390-AAQ** |
| ~~10801 Rockville Pike~~ | * | |
| ~~Rockville, Maryland 20852~~ | * | |
| ~~and~~ | * | |
| ~~**KIM CAVITT**~~ | * | |
| ~~1420 W. Norwood Street~~ | * | |
| ~~Chicago, Illinois 60660~~ | * | |
| **Defendants.** | * | |

* * * * * * * * * * * * *

## AMENDED VERIFIED COMPLAINT

Plaintiff, Keith N. Darrow, Ph.D. ("Dr. Darrow" or "Plaintiff"), by his undersigned attorneys, pursuant to 28 U.S.C. § 1332(a)(1), 28 U.S.C. § 2201, and Fed. R. Civ. P. 8, 57, and 65, submits this Amended Verified Complaint against Defendants, American ~~Speech-Language-Hearing~~Speech-Language- Hearing Association ("ASHA") and Kim Cavitt ("Cavitt"), and states as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action seeking a declaratory judgment for the purpose of determining a question of actual controversy between the parties and an injunction enjoining

ASHA from issuing a public censure against Plaintiff based upon its arbitrary and capricious finding that Plaintiff violated certain provisions of ASHA's Code of Ethics.[1] Plaintiff also seeks

---

[1] Pursuant to ASHA's Practices and Procedures § III.D.5, Third-Party Complaints (and their adjudication) are confidential and protected from disclosure. § III.D.5 provides, in pertinent part,

> "[r]espondents may only disclose a Third-Party Complaint to individuals who may be able to assist them in their defense of such complaint. Respondents may not publish, post, or otherwise disseminate—or otherwise permit or encourage any third party to publish, post, or otherwise disseminate—any information regarding such Third-Party Complaint before a Final Decision has been rendered by the BOE."

ASHA's decision against Dr. Darrow was rendered final as of the December 1, 2025 Final Decision letter. Therefore, § III.D.5 does not apply to this Amended Verified Complaint.

compensatory damages against Cavitt, a self-admitted business competitor of Plaintiff, based upon the false and defamatory statements Cavitt made against Plaintiff for the sole purpose of harming Plaintiff and his business.

2. The purported violations of the Code of Ethics are based solely upon Dr. Darrow's use of the following phrases, which have appeared on Dr. Darrow's website and related materials:

- "Preventing dementia is possible"
- "I teach people how to prevent cognitive decline and dementia"

3. Despite a record devoid of supporting evidence, ASHA's Board of Ethics (the "BOE" or "Board") arbitrarily concluded these phrases are misleading because the general public *may* interpret them to mean that "dementia can be prevented *altogether*."[2] (emphasis provided).

4. Not only is the Board's conclusion based on a hypothetical scenario for which no *actual* evidence was provided, but it is also contrary to its own Practices and Procedures, which, in part, require determinations regarding violations of ASHA's Code of Ethics to be based on a preponderance of evidence and are supposed to comply with basic due process requirements.

~~[1] Pursuant to ASHA's Practices and Procedures § III.D.5, Third-Party Complaints (and their adjudication) are confidential and protected from disclosure. § III.D.5 provides, in pertinent part,~~

> ~~"[r]espondents may only disclose a Third-Party Complaint to individuals who may be able to assist them in their defense of such complaint. Respondents may not publish, post, or otherwise disseminate – or otherwise permit or encourage any third party to publish, post, or otherwise disseminate – any information regarding such Third-Party Complaint before a Final Decision has been rendered by the BOE."~~

~~ASHA's decision against Dr. Darrow was rendered final as of the December 1, 2025 Final Decision letter. Therefore, § III.D.5 does not apply to this Verified Complaint.~~

~~[2] Critically, Dr. Darrow never claimed to be able to prevent dementia "altogether." Rather, this narrative was first (and improperly) introduced into the administrative record based upon email correspondence between ASHA's Senior Director of Ethics and Dr. Darrow's counsel.~~

5. Despite these procedural and substantive deficiencies, including blatant violations of Dr. Darrow's due process rights, the Board proposes that Dr. Darrow be publicly censured because he supports and promotes the use of scientifically sound preventative care to reduce the

risk of decline.

6. A public reprimand of this kind will cause Dr. Darrow immediate, substantial, and irreparable injury, loss, and damage.

---

[2] Critically, Dr. Darrow never claimed to be able to prevent dementia "altogether." Rather, this narrative was first (and improperly) introduced into the administrative record by ASHA's Senior Director of Ethics in email correspondence with Dr. Darrow's counsel following the submission of the ethics complaint.

7. Unfortunately, this injustice against Dr. Darrow was precipitated by the false and defamatory statements by Cavitt, a self-admitted business competitor, who has perpetrated an abusive and malicious campaign against Dr. Darrow under the guise of "protecting the public." In reality, Cavitt's sole mission is to tear down Dr. Darrow and his business for her own personal and financial gain.

8. ~~Among other things~~As the latest manifestation of Cavitt's vindictive pattern of animus, Cavitt submitted an ethics complaint to ASHA against Dr. Darrow, in which Cavitt made numerous false and defamatory statements of and concerning Dr. Darrow. ~~Specifically~~For example, Cavitt's ethics complaint wrongly accused Dr. Darrow of making false promises and misrepresenting his credentials~~. Cavitt's ethics complaint is merely the latest manifestation of Cavitt's vindictive pattern of animus~~, among other meritless allegations. The injury, loss, and damage sustained by Dr. Darrow to his current and anticipated business relationships as a result of Cavitt's tortious conduct including, but not limited to, the submission of the ethics complaint, cannot be undone.

9. Accordingly, Dr. Darrow, having exhausted his administrative remedies, is left with no choice but to petition this Honorable Court seeking declaratory, injunctive, and compensatory relief.

**PARTIES**

10. Keith N. Darrow, Ph.D. is a citizen of the Commonwealth of Massachusetts who is domiciled at 36 ~~Sterling~~Sandy Ridge Road, Sterling, Massachusetts ~~10564~~01564.

11. The American Speech-Language-Hearing Association is a non-profit corporation organized under the laws of the State of Kansas with its principal office located at 10801 Rockville Pike, Rockville, Maryland 20852. Accordingly, ASHA is a citizen of both the State of Kansas and the State of Maryland.

12. Kim Cavitt is a citizen of the State of Illinois who is domiciled at 1420 W. Norwood

Street, Chicago, Illinois 60660.

**JURISDICTION AND VENUE**

13. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties in this action.

14. As to ASHA, jurisdiction is proper in this Court because ASHA's principal place of business is located in this judicial district.

15. As to Cavitt, jurisdiction is proper in this Court because Cavitt purposefully directed activities toward this judicial district by actively participating as a member of ASHA, a Maryland-based organization, including, but not limited to, submitting ~~an~~the ethics complaint. After Cavitt submitted the ethics complaint to ASHA in Maryland, she continued to purposefully direct communications toward this judicial district by, among other conduct and activities, sending emails to ASHA's Director of Ethics located in the State of Maryland. Further, Cavitt knew or had reason to know that the harm caused by her tortious conduct would be felt by Dr. Darrow through, and emanate from, proceedings in the State of Maryland.

16. This Court has personal jurisdiction over Cavitt pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1) because Cavitt transacts business and performs work or services in the State of Maryland through, in part, her membership with ASHA, a Maryland-based organization, which gave rise to her submission of the ethics complaint, and her business Audiology Resources, Inc., which provides "operation compliance and reimbursement consulting and training products and services to hearing healthcare providers throughout the United States[,]" including in the State of Maryland.

17. This Court also has personal jurisdiction over Cavitt pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4) because Cavitt regularly does and solicits business and engages in

a persistent course of conduct in the State of Maryland through, in part, her membership with ASHA,[3] a Maryland-based organization, and her business Audiology Resources, Inc., which provides "operation compliance and reimbursement consulting and training products and services to hearing healthcare providers throughout the United States[,]"[4] including in the State of Maryland.[5]

18. This Court also has general and specific jurisdiction over Cavitt pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because Cavitt has sufficient minimum contacts with the State of Maryland such that maintenance of this suit does not offend notions of fair play and substantial justice. For instance, over the course of many years, Cavitt has purposefully availed herself of the privilege of conducting activities in the State of Maryland through, in part, her membership with ASHA, a Maryland-based organization, and her business Audiology Resources, Inc., which provides "operation compliance and reimbursement consulting

---

[3] Upon information and belief, Cavitt has directed payment of membership dues and fees to ASHA located in the State of Maryland over the course of her membership with the organization. Further, Cavitt has previously and purposefully directed activities toward the State of Maryland by submitting, on at least one other occasion, an ethics complaint to ASHA for adjudication against another audiologist.

[4] *See* Audiology Resources, Inc., *Home*, https://audiologyresources.com/ (visited June 18, 2026).

[5] For example, Cavitt has on multiple occasions submitted written testimony to the Maryland General Assembly on issues related to audiology. Most recently, on March 25, 2026, Cavitt submitted written testimony in support of the Maryland Academy for Audiology "and their pursuit to provide basic health screenings…to their patients." *See* Maryland General Assembly, House Health Committee, SB 917 Health Occupations – Practice Audiology, March 25, 2026 (written testimony of Kim Cavitt) https://mgaleg.maryland.gov/cmte_testimony/2026/hlt/122Ytpni3NrJVDeV-Zb67q200bGBlPAhUGtaI.pdf (visited June 18, 2026). Upon information and belief, Cavitt, through her membership of another audiology-focused organization, American Academy of Audiology, frequently works with the Maryland Academy for Audiology and its Maryland-based members.

Further, on or about February 20, 2022, Cavitt submitted written testimony to the Maryland State Board of Examiners for Audiologists, Hearing Aid Dispensers, Speech-Language Pathologists, and Music Therapists concerning HB0830, which related to a requirement for the participation of otolaryngologists in the Maryland State BOE's structure. *See* Maryland General Assembly, House Health & Government Operations Committee, HB0830, February 20, 2022 (written testimony of Kim Cavitt), https://mgaleg.maryland.gov/cmte_testimony/2022/hgo/1jyUJKrAEhRfTpAOXTnKeBWqtlKLvQ5TC.pdf (visited June 18, 2026). Cavitt subsequently engaged, and continues to engage, in discourse regarding Maryland legislation and related topics, including with audiologists located in the State of Maryland. *See* Kim Cavitt, AuD, LinkedIn, *Response to American Academy of Audiology President's Message: Where Are We Going* (Nov. 3, 2024), https://www.linkedin.com/pulse/response-american-academy-audiology-presidents-where-we-cavitt-aud-3eqrc/ (visited June 18, 2026).

and training products and services hearing healthcare providers throughout the United States[,]" including in the State of Maryland. Relevant here, Cavitt submitted the ethics complaint to ASHA and knew or should have known that the harm caused by her tortious conduct would be felt by Dr. Darrow through, and emanate from, proceedings in the State of Maryland.

19. ~~16.~~ Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

20. ~~17.~~ Venue is also proper in this judicial district under 28 U.S.C. § 2201(a) because this case presents an actual controversy within the Court's jurisdiction and Plaintiff is seeking a declaration from the Court as to the rights and legal relations of the parties.

## FACTS COMMON TO ALL COUNTS

### A. Background

21. ~~18.~~ ASHA is a quasi-public, "national professional, scientific, and credentialling association with 241,000 members, certificate holders, and affiliates who are audiologists; speech-language pathologists; speech, language, and hearing scientists; audiology and speech-language pathology assistants; and students." *See* About ASHA, https://www.asha.org/about/ (~~Jan. 30,~~visited June 18, 2026).

22. ~~19.~~ ASHA holds itself out as the foremost credentialing organization for audiologists and speech-language pathologists. ASHA is the de-facto gatekeeper to the professions of audiology and speech-language pathology. Relevant here, ASHA issues its Certificate of Clinical Competence ("CCC"), which is the primary national professional credential representing excellence in the field of audiology (CCC-A) and speech-language pathology (CCC-SLP). *See* ASHA Certification, https://www.asha.org/certification (visited ~~Jan. 30~~June 18, 2026). ~~Further, through~~ Through its

~~its~~ Council on Academic Accreditation in Audiology and Speech-Language Pathology ("CAA"), ASHA "offers voluntary accreditation to graduate degree programs in audiology and speech-language pathology housed within institutions of higher education" and "has the authority establish and enforce a set of standards for the accreditation of graduate education programs in audiology and in speech-language pathology." *See* About the CAA, https://caa.asha.org/about/ (visited ~~Jan.~~June

~~30~~18, 2026). As a result, most higher education programs in audiology and speech-language pathology require clinical instructors and supervisors to maintain current ASHA certification as a condition of employment. The practical effect of this requirement makes ASHA certification mandatory for educators like Dr. Darrow.

23. ~~20.~~ ASHA's operations are governed by its Bylaws, which set forth ASHA's internal rules and procedures. *See* Bylaws of American Speech-Language-Hearing Association, attached hereto as **Exhibit A**. Pursuant to Article III of the Bylaws, members of ASHA agree to abide by

ASHA's Code of Ethics (the "Code"). *See* Code of Ethics (2023), attached hereto as **Exhibit B**.

24. ~~21.~~ Pursuant to Article VII of the Bylaws, ASHA and its members are governed by the Board, which promulgates ASHA's Code and adjudicates complaints alleging violations of the same. Ethics complaints are adjudicated pursuant to the Practices and Procedures of the BOE ("Practices and Procedures"). *See* Practices and Procedures of the Board of Ethics (effective January 1, 2024), attached hereto as **Exhibit C**.

25. ~~22.~~ Dr. Darrow is a neuroscientist, audiologist, and certified dementia practitioner with a doctoral degree from the joint Massachusetts Institute of Technology and Harvard Medical School program in speech and hearing bioscience and technology. Dr. Darrow's

research on the

nervous system and the brain has been published in many peer-reviewed scientific journals that have been cited over 1,350 times to date.

26. ~~23.~~ Among Dr. Darrow's areas of expertise is use of preventative care to reduce the risk of decline, including dementia. On this subject, Dr. Darrow has written and published various books and peer-reviewed articles to educate the public regarding scientifically proven steps one can take to prevent decline, including the association between hearing loss and dementia. For example, Dr. Darrow wrote and published a book called *Preventing Decline: Advances in the Medical Treatment of Hearing Loss & Tinnitus* (2021), in which he advocates~~, among other things, that people who treat hearing loss~~ for all fourteen (14) modifiable risk factors that can reduce ~~their~~the risk of cognitive decline, memory loss and dementia, including the treatment of hearing loss.

27. ~~24.~~ Currently, Dr. Darrow is a tenured professor at Worcester State University, where he teaches undergraduate courses in hearing science and audiology. The program at Worcester State University in which Dr. Darrow teaches and supervises students is ASHA accredited. As a result, Dr. Darrow is required to maintain his ASHA certification as a condition of his employment with the university. Dr. Darrow is also the Director and Founder of the Hearing & Brain Centers of America, as well as the Founder of Excellence in Audiology, which is a nationwide network of certified specialists in hearing and tinnitus. ~~Dr. Darrow is also a tenured professor at Worcester State University, where he teaches undergraduate courses in hearing science and audiology.~~

28. ~~25.~~ Dr. Darrow is also a Co-Founder and Principal of AuDExperts, which is a business consulting, training, and education company serving private audiology practices across the country. AuDExperts provides strategic consulting on practice performance, training,

Case 8:26-cv-00390-AAQ Document 1 Filed 01/30/26 Page 10 of 23

revenue optimization, workflow, compliance, and coding/reimbursement optimization. AuDExperts' mission is to help private audiology practices navigate the pains and struggles of growing their business.

29. 26. Throughout Dr. Darrow's cross-functional initiatives, he has never been denied a license or publicly disciplined by any professional association, licensing authority, or board, or other credentialling regulatory body, nor has Dr. Darrow ever been the subject of a complaint initiated by a client, patient, or member of general public.

30. Dr. Darrow derives business from, and maintains professional relationships in every state in the United States, including Maryland and Massachusetts.

31. 27. Based on publicly available information, Cavitt is a former clinical audiologist who currently operates ana nationwide audiology consulting firm called Audiology Resources, which "offers comprehensive operational, compliance, and reimbursement consulting services to hearing healthcare providers." throughout the United States," including upon information and belief, in Maryland. *See* Audiology Resources, *About Kim Cavitt,* https://www.audiology*Home*, https://audiologyresources.com/ (visited June 18, resources.com/about-kim-cavitt/ (visited Jan. 30, 2026).2026). Cavitt and Audiology Resources serve clients across the country, including in Maryland. Among its services, Audiology Resources offers practice operational review and consulting, coding and reimbursement guidance, training and educational support for private practices, practice expansion support, and revenue cycle consulting. *See* Audiology Resources, *Audiology Practice Review and Consulting Services*, https://audiologyresources.com/consulting-services/ (visited Jan. 30June 18, 2026).

32. 28. Based on publicly available information, Cavitt specializes in maximizing profits for hearing healthcare providers, including the use of proper Current Procedural Terminology

(CPT) codes for preventative care, which may not ordinarily be covered by insurance. *See* Audiology Resources, *Ask the Experts: CPT Codes for Preventative Care*, ~~https://www.audiologyonline.com/ask-the-experts/cpt-codes-for-preventive-care-11630~~https://www.audiologyonline.com/ask-the-experts/cpt-codes-for-preventive-care-11630 (visited ~~Jan. 30~~ June 18, 2026). Upon information and belief, Cavitt has no specialized training or advanced degree in cognitive neuroscience or dementia care, treatment, or prevention.

33. ~~29.~~ Audiology Resources is a business competitor of ~~AuDExperts,~~ Dr. ~~Darrow's consulting business.~~ Darrow and AuDExperts. Both entities provide overlapping services geared toward private audiology practices throughout the United States, including Maryland and Dr. Darrow's home state of Massachusetts, which incorporate strategic consulting on practice performance, training, revenue optimization, workflow, compliance, and coding/reimbursement optimization.

34. ~~30.~~ For the better part of a decade, Cavitt's animus toward Dr. Darrow has been demonstrated in a variety of settings. Over the years, Dr. Darrow has received unsolicited comments from colleagues in the audiology space, conference attendees, potential and prospective collaborators, and professional contacts regarding Cavitt's hostility toward him. These comments include, but are not limited to, "Why does Kim seem to have it out for you" and "I was told by Kim to be careful about collaborating with you because she says you're unethical."

35. ~~31.~~ On one occasion, Cavitt facilitated Dr. Darrow's removal from a Facebook group called "Audiology Happy Hour," because Cavitt claimed Dr. Darrow was not following the group's "policies." There, Cavitt arbitrarily claimed Dr. Darrow violated the group's policy on marketing because he was discussing the publication of his book, *Stop Living in Isolation: How Treating Hearing Loss can change your life, maintain your independence, and may reduce your risk of dementia* (2017). In reality, Dr. Darrow was engaging in important discourse with

members of the audiology and hearing care provider community regarding advancements in the field, including the importance of treating the cognitive aspects of hearing loss. Rather than contribute to this

productive discussion, Cavitt exhibited her personal animus and selfish business interests by banning Dr. Darrow from the group and posting defamatory comments about him.

36. More recently, Cavitt has engaged in significant discourse on LinkedIn which both implicitly and explicitly demonstrated her personal animus toward Dr. Darrow. In April 2023, Cavitt posted an article titled *Why the Language We Use Matters*, in which she specifically identified "prevent" as a term used in audiology that requires scrutiny, especially in the context of the correlation between untreated hearing loss and dementia. *See* https://www.linkedin.com/pulse/why-language-we-use-matters-kim-cavitt-aud/ (visited June 18, 2026). This article warned audiologists not to "bastardize research evidence for personal gains" and accused audiologists who use the term "prevent" of making "false promises and fear mongering" *Id.* These statements clearly refer to Dr. Darrow and mirror language used by her in her ASHA submission.

37. In these instances, among others, Cavitt specifically targeted individuals and entities that she knew were Dr. Darrow's clients, collaborators, and prospective partners.

38. Indeed, Cavitt knew or should have known that her oral and written statements against Dr. Darrow would (and did) cause harm to Dr. Darrow's past, present, and future business relationships, including those located in Maryland, Massachusetts, and throughout the United States.

39. ~~32.~~ Given the competitive overlap between Dr. Darrow and Cavitt's businesses, in combination with the long-running pattern of disparaging remarks directed at Dr. Darrow, Cavitt's actions cannot be viewed in isolation from her professional and business interests.

40. ~~33.~~ Unfortunately, these injurious falsehoods are not isolated, one-off occurrences.

Rather, they exhibit a pattern of malice and bias designed to damage Dr. Darrow's reputation and professional relationships, which culminated in the defamatory Ethics Complaint that is the subject of this action.

**B. <u>Cavitt Ethics Complaint and BOE Initial Determination</u>**

41. ~~34.~~ On August 30, 2024, Cavitt filed a complaint against Dr. Darrow with ASHA's BOE alleging violations of ASHA's Code (the "Ethics Complaint"). *See* August 30, 2024 Ethics Complaint, attached hereto as **<u>Exhibit D</u>**. Cavitt alleged Dr. Darrow was in violation of Principle of Ethics II requiring individuals to "honor their responsibility to achieve and maintain the highest level of professional competence and performance" and Principle of Ethics III requiring individuals in their professional role to "act with honesty and integrity when engaging with the public and shall provide accurate information involving any aspect of the professions." *See* Exhibit B at p. 6-7.

42. ~~35.~~ As to the alleged violation of Principle of Ethics II, Cavitt accused Dr. Darrow of, among other things, misrepresenting his credentials as a neuroscientist and audiologist, as well as practicing medicine and audiology in various states without a license. *See* November 5, 2024 Reply to Response to Ethics Complaint, attached hereto as **<u>Exhibit E</u>**. Cavitt accused Dr. Darrow

of not being "transparent about his actual earned education," and claimed that the title of Dr. Darrow's book, *Preventing Decline,* alone "could constitute the practice of medicine." *Id.*

43. ~~36.~~ Beyond Cavitt's bald assertion that "[c]onsumers *could* perceive Dr. Darrow as a care provider based on how [Dr. Darrow's website] is designed and the information conveyed," Cavitt provided no evidence that Dr. Darrow actually engaged in any unlicensed or

unauthorized activity nor that any "consumer" had actually been misled by Dr. Darrow's website or materials. *Id.* (emphasis added).

44. ~~37.~~ As to the alleged violation of Principle of Ethics III, Cavitt accused Dr. Darrow of misleading the public by stating that "preventing dementia is possible" and claiming to "teach people how to prevent cognitive decline and dementia." *See* Exhibit E. These statements appear on Dr. Darrow's website located at www.drkeithdarrow.com and the Excellence in Audiology website located at www.excellenceinaudiology.org, respectively, and ~~relate to Dr. Darrow's research supporting~~reflect the scientific consensus of published, peer-reviewed articles on the correlation between hearing loss and dementia.

45. ~~38.~~ In essence, as to Principle of Ethics III, Cavitt accused Dr. Darrow of false advertising.

46. ~~39.~~ Beyond alleging Dr. Darrow's statements were misleading, Cavitt did not claim that she was misled by either statement, nor did Cavitt provide any evidence that *anyone* has ever been misled by Dr. Darrow's statements about dementia and cognitive decline.

47. ~~40.~~ As described above, the Ethics Complaint was the latest manifestation of Cavitt's obsessive and malicious harassment of Dr. Darrow. For many years, Cavitt has used various forms and various means to carry out her ongoing wrongful, abusive, and malicious campaign against Dr. Darrow. Indeed, Cavitt does not dispute her "professional misgivings" of Dr. Darrow. *See* Exhibit E at p. 10 (admitting, "I have taken steps, through professional associations and state licensure boards, to ensure that the public and audiologists are protected from [Dr. Darrow's] false promises, misinformation and misrepresentation of his credentials…").

48. ~~41.~~ Indeed, Dr. Darrow recently discovered that Cavitt filed a similar ethics

complaint against an audiologist located in Chicago, Illinois, which resulted in public censure by the BOE on August 29, 2024 (one day before Cavitt filed the Ethics Complaint against Dr. Darrow). The BOE's rationale for that finding was that the censured audiologist "[p]ublished advertisements containing misleading and incorrect information regarding the relationship between dementia and hearing loss." *See* ASHA, *Board of Ethics Decisions*, https://www.asha.org/practice/ethics/boe-decisions/ (visited ~~Jan. 30~~June 18, 2026). Upon information and belief, this BOE decision was not challenged by the censured audiologist, which emboldened Cavitt to go after Dr. Darrow and his business~~.~~[3].[6]

49. ~~42.~~ Curiously, and as further evidence demonstrating Cavitt's personal animus toward Dr. Darrow, there are droves of ASHA members or affiliates publishing the same or similar phrases regarding dementia prevention that have not been targeted by Cavitt or ASHA. *See, e.g.*, ASHA Evidence Maps, National Academies of Sciences, Engineering and Medicine – Consensus Study Report, *Preventing Cognitive Decline and Dementia: A Way Forward* (2017), available at https://apps.asha.org/EvidenceMaps/Articles/ArticleSummary/81f08e96-12d1-4b7c-84a5-ef70ebe6989a (visited ~~Jan. 30~~June 18, 2026); Advance Audiology Services, *Hearing Health & Dementia Prevention*, https://www.advancedaudiologyservices.com/hearing-health-dementia-cognitive-decline-prevention/ (visited ~~Jan. 30~~June 18, 2026); Alamance ENT Audiology Clinic, *Prevent Dementia with Good Hearing*, https://www.alamanceaudiology.com/blog/prevent-dementia-with-good-

---

~~[3] Upon information and belief, the censured audiologist did not challenge Cavitt's ethics complaint because she is a clinician, whose private audiology practice, career, and professional standing would not be impacted by ASHA's censure. A censure against Dr. Darrow, on the other hand, will have devastating consequences as demonstrated below.~~

hearing (visited ~~Jan. 30~~June 18, 2026). Beyond ASHA, there are articles published regularly regarding

prevention of cognitive decline and dementia. *See, e.g.*, L. Cribb, et al., *Treating Hearing Loss and Dementia With Hearing Aids for the Prevention of Cognitive Decline and Dementia*, NEUROLOGY (Jan. 2026), available at https://www.neurology.org/doi/10.1212/WNL.0000000000 214572) (visited ~~Jan. 30~~June 18, 2026). Despite the prevalence of (and recent) use of these words or phrases related to dementia prevention, Cavitt has targeted Dr. Darrow, because she has something to gain from damaging Dr. Darrow and his business interests.

50. ~~43.~~ Dr. Darrow responded to the Ethics Complaint affirming his support of preventive care to reduce the risk of decline, which is widely accepted in the relevant scientific communities and echoed by national media. *See* October 3, 2024 Response to Ethics Complaint, attached hereto as **Exhibit F**; *and see* January 15, 2025 Second Response to Ethics Complaint, attached hereto as **Exhibit G**.

51. ~~44.~~ In his response, Dr. Darrow referred to materials ASHA itself has published related to preventative care and the association of hearing loss and dementia. *See, e.g.*, ASHA, *About ASHA*, https://www.asha.org/about/ ("Audiologists specialize in *preventing* and assessing hearing and balance disorders as well as providing audiologic treatment, including hearing aids.") (emphasis added) (visited ~~Jan. 30~~June 18, 2026); *and see* ASHA, *The Value of Audiology: Hearing Loss and Cognitive Decline/Dementia*, available at https://www.asha.org/siteassets/ebp/dov/value-of-audiology-hearing-loss-and-cognitive-decline-dementia.pdf (visited ~~Jan. 30~~June 18, 2026).

[6] Upon information and belief, the censured audiologist did not challenge Cavitt's ethics complaint because she is a clinician, whose private audiology practice, career, and professional standing would not be impacted by ASHA's censure. A censure against Dr. Darrow, on the other hand, will have devastating consequences as demonstrated below.

52. ~~45.~~ Dr. Darrow further responded by providing references to published and peer- reviewed medical literature on the topic of dementia prevention, all of which provide ample proof that prevention of decline is possible. *See, e.g.*, U.S. Centers for Disease Control & Prevention, *Reducing Risk for Dementia* (Aug. 27, 2024) ("Did you know? Nearly 45% of all dementia cases may be prevented or delayed."), available at https://www.cdc.gov/alzheimers-dementia/prevention /index.html; Lancet Commission, *Dementia Prevention, Intervention, and Care* (2024) (concluding that "nearly half of dementias could theoretically be prevented by eliminating" 14 risk factors, including hearing loss); M. Masocco, et al., *Preventing Dementia Is Possible*, 34 EUR. J. OF PUB. HEALTH (Nov. 2024), available at https://academic.oup.com/eurpub/article/34/ Supplement_3/ckae144.2149/7844640; Ruan-Ching Yu, et al., *Adult-Onset Hearing Loss and Incident Cognitive Impairment and Dementia*, 98 AGEING RESEARCH REVS. (2024) (concluding that cohort studies consistently support that adult-onset hearing loss increases the risk of incident cognitive decline, dementia, MCI, and ADD); Smith AD, Yaffe K., *Dementia (including Alzheimer's disease) can be prevented: statement supported by international experts*, J ALZHEIMER'S DIS. (2014), available at https://pubmed.ncbi.nlm.nih.gov/24326609/.

53. ~~46.~~ Additionally, Dr. Darrow submitted letters from Dr. Douglas L. Beck, Au.D., renowned audiologist and 2026 American ~~Association~~Academy of Audiology "Excellence in Audiology" Award Recipient, and Bopanna Ballachanda, Ph.D., past president of the American ~~Association of~~Academy of Audiology, attesting to Dr. Darrow's "profound knowledge of neuroscience and audiology" and "high moral and ethical standing" and describing Dr. Darrow as "a distinguished colleague and influential leader in audiology," who "continues to elevate the standards of care and education in our profession." *See* Exhibit F at Exhibit 3; *and see* Exhibit G at Exhibit 12.

54. ~~47.~~ Despite a lack of evidence (or even substantive allegation) that Dr. Darrow's statements *actually* misled anyone, and in the face of the mountain of uncontroverted evidence proffered by Dr. Darrow demonstrating that dementia can be prevented or that it is "possible", the BOE issued an "Initial Determination" finding that Dr. Darrow violated Principles of Ethics III and IV. *See* March 21, 2025 Initial Determination, attached hereto as **Exhibit H**. The BOE dismissed Cavitt's complaints related to purported violations of Principle of Ethics II (*i.e.*, misrepresenting his credentials, providing services in states in which he is not licensed, and practicing medicine without a license), explicitly finding that these allegations were meritless. *Id.* The BOE contemporaneously issued an Order to Cease and Desist, which required Dr. Darrow to cease "making any public statement that asserts, implies, or suggests that dementia can be prevented" and to provide written confirmation of compliance with Order within 30 days. *See* March 21, 2025 Order to Cease and Desist, attached hereto as **Exhibit I**.

55. ~~48.~~ Curiously, the Ethics Complaint did not allege that Dr. Darrow violated Principle of Ethics IV ("Individuals shall uphold the dignity and autonomy of the professions, maintain collaborative and harmonious interprofessional and interprofessional relationships, and accept professions' self-imposed standards."). Yet, the BOE's Initial Determination found Dr. Darrow in violation of Principle of Ethics IV, Rule D. This finding in and of itself was violative of Practices and Procedures § II.G, which precludes the BOE from conducting "independent investigations" into complaints of Code of Ethics violations. *See* Exhibit C at p. 4.

56. ~~49.~~ As to Principle of Ethics III, the BOE found Dr. Darrow in violation of Rule C ("Individuals shall not misrepresent diagnostic information, services provided, results of services provided, products dispensed, effects of products dispensed, or research or scholarly activities."), Rule E ("Individuals' statements to the public shall provide accurate information

regarding the professions, professional services and products, and research and scholarly activities.”), and Rule F (“Individuals’ statements to the public shall adhere to prevailing professional standards and shall not contain misrepresentations when advertising, announcing, or promoting their professional services, products, or research.”).

57. ~~50.~~ As to Principle of Ethics IV, the BOE found Dr. Darrow in violation of Rule D (“Individuals shall not engage in any form of conduct that adversely reflects on the professions or on the individual’s fitness to serve persons professionally.”).

58. ~~51.~~ The BOE’s stated rationale for each purported violation was, “as evidenced by [Dr. Darrow] making multiple misleading and false statements that dementia can be prevented.” *See* Exhibit H (Initial Determination).

59. ~~52.~~ The BOE’s Initial Determination did not refer to specific statements made by Dr. Darrow nor did it cite any evidence or authority supporting the conclusion that Dr. Darrow’s statements were “misleading and false.”

60. ~~53.~~ Based upon the findings set forth in the Initial Determination, the BOE proposed a sanction of “Censure (public),” which is defined by ASHA as “a public rebuke or condemnation with broad disclosure.” *See* How ~~AHSA’s~~ASHA’s Board of Ethics (BOE) Sanctions Individuals Who Violate the ASHA Codes, ~~https://www.asha.org/practice/ethics/sanctions/~~https://www.asha.org/practice/ethics/sanctions/ (visited ~~Jan. 30~~June 18, 2026).

The Initial Determination advised that the proposed sanction, upon becoming final, would be published in an ASHA publication that is distributed and available to all ASHA members and may be provided to any person or entity requestion a copy, as well as any state agency that has provided Dr. Darrow a license or credential, any state agency located in the state in which Dr. Darrow

resides, and any other professional organization of which Dr. Darrow is a member that enforces a code of ethics or code of professional conduct.

61. ~~54.~~ Finally, the Initial Determination notified Dr. Darrow of his right, pursuant to the Practices and Procedures, to request a Further Consideration Hearing in front of the BOE, at which Dr. Darrow could present his case as to why the purported violations of the Code should be modified and/or why the proposed sanction should be reduced.

62. ~~55.~~ On April 11, 2025, Dr. Darrow formally requested a Further Consideration Hearing and notified the BOE of his intention to present witnesses.

### C. Board of Ethics Proceedings: Further Consideration Hearing, Request for Appeal, and Final Decision

63. ~~56.~~ Pursuant to Dr. Darrow's request, a Further Consideration Hearing was scheduled for June 24, 2025.

64. ~~57.~~ In advance of the Further Consideration Hearing, Dr. Darrow submitted a Further Consideration Hearing Brief ("FCH Brief") setting forth the reasons why the Ethics Complaint should be summarily dismissed for insufficient evidence in accordance with Practices and

Procedures III.F.5.f and III.G.4. *See* May 28, 2025 Further Consideration Hearing Brief, attached hereto as **Exhibit J**.

65. ~~58.~~ Specifically, Dr. Darrow noted: (1) there was no evidence that Dr. Darrow ever misled anyone about dementia prevention; (2) there was no evidence that anything Dr. Darrow ever stated about dementia prevention was false or inaccurate; and (3) there was no evidence that Dr. Darrow ever indicated, explicitly or implicitly, that he or anyone else can prevent dementia "altogether," or guarantee that someone never experiences it.

66. ~~59.~~ To support these assertions, the FCH brief submitted written testimony of

Mitchell Clionsky, Ph.D., ABPP-CN, a highly-respected and undisputed expert in the field of neuropsychology, dementia, and dementia prevention, who testified, *inter alia*, that: (1) the term "prevention" is the same as risk reduction; (2) prevention is well-accepted in the field of dementia; (3) Dr. Darrow's statements that dementia is preventable and that Dr. Darrow can teach people how to prevent dementia were honest and accurate and consistent with the current state of science; (4) hearing loss is a major contributor to cognitive decline and dementia and is an important dementia prevention target; and (5) the science repeatedly finds that nearly half of all dementias can be prevented.

67. ~~60.~~ In the FCH Brief, Dr. Darrow noted a public reprimand/censure as proposed by the Initial Determination would be contrary to the public's interest and current state of science on dementia prevention. Indeed, ASHA's own publication discussed the prevalence of untreated hearing loss in adults and that "64% say they would be 'much more' or 'more' likely to seek treatment for hearing difficulties if they knew it could help lower the risk of developing dementia later in life." *See* ASHA News, *New Poll of U.S. Adults Reveals Widespread Inaction on Hearing Loss*, https://www.asha.org/news/2021/new-poll-of-us-adults-reveals-widespread-inaction-on-hearing-loss (visited ~~Jan. 30~~June 18, 2026). Dr. Darrow further advised that a sanction of this kind would cause him immediate and irreparable injury, loss, and damage.

68. ~~61.~~ At the Further Consideration Hearing on June 24, 2025, Dr. Darrow reiterated the points made in his FCH Brief. Dr. Darrow testified, *inter alia*, that: (1) he has never promised or represented that he can guarantee or ensure that someone will never get dementia; (2) he does not believe any of his public statements regarding dementia are misleading or likely to mislead the general public; (3) no member of the general public has ever claimed to have been misled by any statement of his regarding dementia prevention. *See* June 24, 2025 Transcript of

Further Consideration Hearing, attached hereto as **<u>Exhibit K</u>**.

69. ~~62.~~ In addition to his own testimony, Dr. Darrow presented video testimony from Dr. Clionsky and Dr. ~~Ballanchanda~~Ballachanda. The testimony of Drs. Clionsky and ~~Ballanchanda~~Ballachanda affirmed the veracity and accuracy of Dr. Darrow's statements regarding dementia prevention, and testified that Dr. Darrow is a well-respected member of the neuroscience and audiology communities, and his character and ethics have never come into question.

70. ~~63.~~ Despite the evidence and testimony presented, the BOE was distracted by a distinction it claimed, without support, caused Dr. Darrow's statements to be false and misleading.

Specifically, the BOE took issue with Dr. Darrow's choice to use the word "prevent" versus "risk reduction." The BOE further drew a distinction between statements made to the medical and science community versus statements made to the "general public" because Dr. Darrow's statements were purportedly "being advertised" to the general public and not the medical and science community~~.~~[~~4~~].[7]

[7] The BOE's insistence that the term "prevention," while perhaps clear in the medical and science community, may be misleading to the general public is belied by the fact that government and private agencies alike use the term "prevention" in the same context as Dr. Darrow, including in the context of handwashing. *See, e.g.*, Centers for Disease Control and Prevention, *Handwashing Facts*, https://www.cdc.gov/clean-hands/data-research/facts-

71. ~~64.~~ Throughout the FCH hearing, it was clear that the BOE was needlessly focused on a narrow understanding of one definition of the term "prevent" and refused to consider the use of the term in context.[~~5~~8]

72. ~~65.~~ For example, the BOE posed the following question:

> Is it reasonable for a person to think that 'disease prevention' means that by doing something when [sic] – they will not get a disease while 'risk reduction' means a person can stake certain steps to lower the possibility of getting a disease, i.e., hand-washing. Hand-washing reduces your risk of getting sick but will not ensure you from getting sick. Are those individuals wrong?

Exhibit K at 33:11-19.

73. ~~66.~~ In response, Dr. Darrow testified:

> … I think a reasonable layperson would understand, … growing up as a child, I was taught by Smokey the Bear that I can prevent wildfires, yet I live in the Northeast and I am constantly flooded – the air quality in – where I live is flooded with smoke from forest fires that come down from Canada or Upstate New York.
>
> So, no, … I do not believe a reasonable layperson would confuse the words 'prevent' and think that meant some almighty statement of it's something that I could completely eradicate. The same as people who don't smoke that get lung cancer, the same as men who get breast cancer…
>
> There's a lot of nuance in clinical science, which is why, again, to quote Dr. Clionsky, prevention is considered the same as risk reduction in the field of clinical science.
>
> Exhibit K at 35:3-36:1.

74. Beyond the exercise in semantics, Dr. Darrow challenged the BOE's proposed sanction of public censure as unwarranted and inappropriate under the circumstances. Not only

---

~~[4] The BOE's insistence that the term "prevention," while perhaps clear in the medical and science community, may be misleading to the general public is belied by the fact that government and private agencies alike use the term "prevention" in the same context as Dr. Darrow, including in the context of handwashing. *See, e.g.*, Centers for Disease Control and Prevention, *Handwashing Facts*, https://www.cdc.gov/clean-hands/data-research/facts-~~stats/index.html (stating, "Washing hands prevents illnesses and spread of infections to others"); World Health Organization, *Handwashing prevents 740,000 deaths a year*, https://www.who.int/multi-media/details/handwashing-prevents-740-000-deaths-a-year; Mayo Clinic, *Hand-Washing: Do's and Don'ts* ("Hand-washing is an easy way to *prevent* infection.", https://www.mayoclinic.org/healthy-lifestyle/adult-health/in-depth/hand-washing/art-20046253.

[~~5~~8] Importantly, the BOE cited just one of Merriam-Webster's definitions of the transitive verb "prevent" (i.e., to keep from happening or existing) and ignored Merriam-Webster's other published definitions (i.e., to hold or keep back: hinder, stop). https://www.merriam-webster.com/dictionary/prevent (visited ~~Jan. 30~~June 18, 2026). Indeed, Merriam- Webster provides the following example of use of the term "prevent" in a sentence: "Can exercise and a healthy diet prevent heart disease?" *Id.*

> ~~could completely eradicate. The same as people who don't smoke that get lung cancer, the same as men who get breast cancer…~~
>
> ~~There's a lot of nuance in clinical science, which is why, again, to quote Dr. Clionsky, prevention is considered the same as risk reduction in the field of clinical science.~~
>
> ~~Exhibit K at 35:3-36:1.~~

~~67. Beyond the exercise in semantics, Dr. Darrow challenged the BOE's proposed sanction of public censure as unwarranted and inappropriate under the circumstances. Not only~~ was there

insufficient evidence demonstrating that Dr. Darrow violated ASHA's Code, but the BOE's subjective belief that a *hypothetical* member of the general public *may* misinterpret Dr. Darrow's statements regarding dementia prevention certainly could not justify a public reprimand that will destroy Dr. Darrow's career.

75. ~~68.~~ On July 23, 2025, the BOE issued its Decision After Further Consideration (the "Decision") concluding that Dr. Darrow violated Rules C, E, and F of Principle of Ethics III "as evidenced by [Dr. Darrow] making multiple misleading statements in public advertising that dementia can be prevented."~~[6]~~[9] *See* July 23, 2025, Decision After Further Consideration, attached hereto as **Exhibit L**. Based on this purported finding/conclusion, the BOE affirmed the proposed sanction from the Initial Determination of censure against Dr. Darrow and issued an Amended Order to Cease and Desist directing Dr. Darrow to cease "making any public advertising statement containing any claim about preventing dementia that doesn't clarify that 'prevent' means the reduction of risk of dementia." *See* July 23, 2025 Amended Order to Cease and Desist, attached hereto as **Exhibit M**.

~~[6] Of note, the BOE reversed its prior finding/conclusion that any statement attributable to Dr. Darrow about dementia prevention was *false* apparently because the BOE realized that all of Dr. Darrow's statements, that it had previously found to be false, are in fact true and accurate.~~

76. ~~69.~~ On October 6, 2025, Dr. Darrow submitted a Request for Appeal to the Ethics Appeal Panel regarding the July 23, 2025 Decision After Further Consideration and related Amended Order to Cease and Desist ("Request for Appeal"), in which Dr. Darrow asserted, by clear and convincing evidence, why the BOE did not adhere to its own procedural requirements and why the decision of the BOE was arbitrary and capricious. *See* October 6, 2025 Request for Appeal, attached hereto as **Exhibit N**.

[9] Of note, the BOE reversed its prior finding/conclusion that any statement attributable to Dr. Darrow about dementia prevention was *false* apparently because the BOE realized that all of Dr. Darrow's statements, that it had previously found to be false, are in fact true and accurate.

77. ~~70.~~ On December 1, 2025, ASHA denied Dr. Darrow's Request for Appeal stating "the [Request for Appeal] failed to show, by clear and convincing evidence, that the BOE did not adhere to procedural requirements or that the decision of the BOE was arbitrary and capricious," thereby rendering the BOE's Decision After Further Consideration final (the "Final Decision"). *See* December 1, 2025 Final Decision letter, attached hereto as **<u>Exhibit O</u>**.

78. ~~71.~~ ASHA's denial of Dr. Darrow's Request for Appeal is one example of many glaring procedural failures and violations of due process. ASHA Practices and Procedures § III.J.2 states, in pertinent part, "[t]he request for appeal of a Decision After Further Consideration must *assert*, by clear and convincing evidence, that the BOE did not adhere to procedural requirements and/or that the decision of the BOE was arbitrary and capricious." *See* Exhibit C (Practices and Procedures) (emphasis added). Yet, as set forth above, the Final Decision letter found that Dr. Darrow's Request for Appeal "failed to *show*, by clear and convincing evidence, that the BOE did not adhere to procedural requirements or that the decision of the BOE was arbitrary and capricious." *See* Exhibit O (emphasis added).

79. ~~72.~~ ASHA's rules further indicate that a Request for Appeal will be evaluated by ASHA's Senior Director of Ethics to ensure that the request meets the procedural requirements set in Practices and Procedures § III.J.2. *See* ASHA Practices and Procedures for Appeals of Board of Ethics Decisions (January 2024), available from www.asha.org/policy (visited ~~Jan. 30~~June 18, 2026).

However, the Final Decision letter reveals that, "an Ethics Appeal Panel met to review [Dr. Darrow's Request for Appeal] with ASHA's outside legal counsel present" and that the decision to deny Dr. Darrow's Request for Appeal was made by the Ethics Appeal Panel and *not* the Senior

Director of Ethics as required by the rules. See Exhibit O.

80. ~~73.~~ The findings in the Final Decision letter contradict the BOE's own Practices and Procedures, and are emblematic of the BOE's failure to protect Dr. Darrow's due process rights in reaching its ultimate, arbitrary, and capricious conclusion, including the proposed sanction of public censure.

81. ~~74.~~ Nonetheless, as a result of the Final Decision, Dr. Darrow is required to provide written notice of compliance with the Amended Order to Cease and Desist within thirty (30) days. *See* Exhibit M. Additionally, the Final Decision requires ASHA to publicly disclose the proposed sanction of Censure. *See* Exhibit C.

82. ~~75.~~ However, ASHA, through its Senior Director of Ethics, agreed not to make public disclosure of any matters pertaining to this BOE proceedings, including public Censure, until the termination of this litigation.

**D. The Board of Ethics' Decision Was Arbitrary and Capricious and Violated Dr. Darrow's Due Process Rights**

83. ~~76.~~ ASHA is a quasi-public entity engaging in licensing, accreditation, discipline, and regulation of the audiology profession and is, therefore, subject to common law due process requirements. Accordingly, ASHA members may reasonably expect a fair and impartial procedure for the adjudication of claims made against them. In fact, ~~AHSA's~~ASHA's Bylaws acknowledge that due process considerations are of critical importance and must be protected in its Practices and Procedures. *See* Exhibit A at Article VII § 7.3.

84. ~~77.~~ Despite the uncontroverted fact that "prevention" means risk reduction, the BOE erroneously concluded in the Final Decision that the following "public advertising" statements used by Dr. Darrow are "misleading" and, therefore, violative of Rules C, E, and F of Principle of

Ethics III:

- "Preventing dementia is possible"
- "I teach people how to prevent cognitive decline and dementia"

85. 78. Rule C of Principle of Ethics III provides, "[i]ndividuals shall not *misrepresent* … services provided, results of services provided, products dispensed, effects of products dispensed, or research and scholarly activities" (emphasis added). *See* Exhibit B at p. 7.

86. 79. Rule E of Principle of Ethics III provides, "[i]ndividuals' statements to the public shall provide *accurate information* regarding the professions, professional services and products, and research and scholarly activities" (emphasis added). *Id.*

87. 80. Rule F of Principle of Ethics III provides, "[i]ndividuals' statements to the public shall adhere to prevailing professional standards and shall not contain *misrepresentations* when advertising, announcing, or promoting their professional services, products or research" (emphasis added). *Id.*

88. 81. First, the Final Decision was arbitrary and capricious because it was not only "highly probable" but undisputed that both statements at issue are true, accurate, and "in accordance with the facts" established in the record—and, therefore, neither makes, contains, or is a "misrepresentation" (as that term is defined in ASHA's Code).[7].[10] And second, the BOE did not adhere to its procedural requirements mandating that the Complaint be dismissed where there is

[7] ASHA's Code defines "misleading" as "not in accordance with the facts."

no evidence in the record showing that either statement is false or "not in accordance with the facts" established in the record.

89. 82. Throughout the BOE proceedings, it was undisputed that neither of the above-quoted statements are actually or inherently "misleading" (as that term is defined in ASHA's Code), and there was no evidence that anyone (including Cavitt) has actually ever been "misled" by either

statement—or any other public-advertising statement of Dr. Darrow. Indeed, the only evidence presented beyond the testimony of Dr. Darrow was the testimony of Drs. Clionsky and Ballachanda, who testified that Dr. Darrow's statements and teachings are not misleading but, in fact, true. As a result, there is a complete absence of any evidence to justify the BOE's conclusion in the Final Decision regarding Rules, C, E, and F of Principle of Ethics III.

90. ~~83.~~ Because the BOE's conclusion in the Final Decision regarding Rules C, E, and F of Principle of Ethics III was based entirely on the BOE's unmoored and misguided discretion, semantical preferences, and paternalistic speculation and conjecture rather than on the uncontroverted evidence, established facts, and fixed procedural rules, it was arbitrary and capricious.

91. ~~84.~~ According to the BOE's procedural rules, preponderance of the evidence is "[t]he burden of proof for Initial Consideration Hearings and Further Consideration Hearings," and "[t]his standard is met when the evidence shows that the alleged Code of Ethics … violation more likely than not did occur." *See* Exhibit C at §§ VI and III.E.1 (requiring "determinations regarding violations of the Codes" to be based on "a preponderance of the evidence"). This burden was necessarily on Cavitt and, if this burden was not met, the BOE was required to dismiss the Ethics Complaint. *See id.* § III.D.2.c.

92. ~~85.~~ As set forth above, there was a complete absence of any evidence that Dr. Darrow misled anyone. There was a complete absence of any evidence that Dr. Darrow made any public- advertising statement that was "misleading (i.e., not in accordance with the facts)." And there was a complete absence of any evidence that a violation of Rules C, E, or F of Principle of Ethics III in fact occurred. Therefore, Cavitt failed to meet the required burden to prove a

[10] ASHA's Code defines "misleading" as "not in accordance with the facts."

violation by a preponderance of the evidence, and the Ethics Complaint should have been dismissed in its entirety

in accordance with applicable procedural requirements (and due process). However, in rendering its Final Decision, the BOE inexplicably failed to do so.~~[8]~~[11]

93. ~~86.~~ Further, the BOE's proposed imposition of a "sanction of Censure (public)" against Dr. Darrow was itself arbitrary and capricious because ASHA's Practices and Procedures provides no standard or metric for determining whether or what sanction should be imposed under any scenario. Rather, Practices and Procedures purports to give the BOE unbridled discretion to impose or refrain from imposing any sanction under any scenario, regardless of the circumstances, the respondent's intentions, or the lack of prior notice or warning.

94. ~~87.~~ This is unfair, improper, and violative of Dr. Darrow's rights (including his due- process rights), especially because Dr. Darrow has demonstrated that immediate and irreparable injury, loss, and damage will result.

95. ~~88.~~ According to ASHA's Bylaws, "the procedures formulated by the Board of Ethics for processing allegations of Code of Ethics and Code of Conduct violations" must "comply with basic due process considerations." *See* Exhibit A at Article VII, Section 7.3.

96. It is clear that ASHA's Practices and Procedures are designed to provide due process and ensure fair adjudication of ethics complaints because ASHA recognizes that sanctions may have devastating consequences to its members. ASHA's failure to follow its own Practices and Procedures throughout its adjudication of the Ethics Complaint against Dr. Darrow is prima facie evidence that Dr. Darrow's "basic due process" rights were violated.

[~~8~~11] Upon information and belief, the Final Decision rendered by ASHA is the first of its kind, other than the unchallenged August 29, 2024 censure of the clinician in Chicago, Illinois. Given these facts, it is likely that ASHA had no prior experience following or enforcing the Practices and Procedures at issue here. Discovery will undoubtedly further illuminate the behind-the-scenes activities of ASHA's kangaroo court.

~~89. It is clear that ASHA's Practices and Procedures are designed to provide due process and ensure fair adjudication of ethics complaints because ASHA recognizes that sanctions may have devastating consequences to its members. ASHA's failure to follow its own Practices and Procedures throughout its adjudication of the Ethics Complaint against Dr. Darrow is prima facie evidence that Dr. Darrow's "basic due process" rights were violated.~~

### E. <u>Harm to Dr. Darrow and the Public Interest</u>

97. ~~90.~~ Dr. Darrow is a tenured professor at Worcester State University, a nationally recognized neuroscientist and audiologist, a peer-reviewed researcher, and an internationally invited speaker on the relationship between hearing loss, cognition, and dementia. Dr. Darrow is also a member of the National Council of Certified Dementia Practitioners and holds a coveted certificate to teach their courses.[~~9~~12] His professional standing depends fundamentally on his reputation for scientific integrity, ethical conduct, and academic credibility. Each of these prestigious distinctions will be lost as a result of ASHA's proposed unjustified public censure.

98. ~~91.~~ *First*, Dr. Darrow faces substantial and imminent risk of losing his tenured faculty position at Worcester State University. Academic tenure is grounded in trust, professional ethics, and scholarly integrity. A public censure impugning Dr. Darrow's professional conduct will irreparably damage Dr. Darrow's standing within the academic community and undermine the institutional trust necessary to continue in that role.

99. ~~92.~~ *Second*, Dr. Darrow's professional reputation as an invited expert will be irreversibly harmed. Dr. Darrow has received multiple confirmed speaking invitations for 2026 and beyond, including international invitations in Saudi Arabia, Germany, South Korea, Ireland,

~~[9] Dr. Darrow teaches a course entitled “Alzheimer’s Disease and Dementia Care” for the National Council of Certified Dementia Practitioners, which is recognized by the Centers for Medicare and Medicaid Services and includes a section on prevention.~~

and England, as well as domestic invitations across the United States (Oklahoma, New York, Arizona, and North Carolina). A public censure against Dr. Darrow will result in immediate retraction of these invitations and foreclose future invitations indefinitely. Once a professional speaker’s credibility is compromised in this manner, the loss of trust cannot be undone, even if monetary compensation were available.

[12] Dr. Darrow teaches a course entitled “Alzheimer’s Disease and Dementia Care” for the National Council of Certified Dementia Practitioners, which is recognized by the Centers for Medicare and Medicaid Services and includes a section on prevention.

100. ~~93.~~ *Third*, Dr. Darrow expects to lose his status and credentials as an approved continuing education presenter for major professional organizations, including ASHA, the International Hearing Society, and the American Academy of Audiology. These credentials are not fungible, are not guaranteed to be reinstated, and are foundational to Dr. Darrow’s professional identity. Their loss will permanently impair his ability to teach, present, and contribute to the profession, and the calculation of related damages would be impossible.

101. ~~94.~~ *Fourth*, Dr. Darrow’s ability to publish peer-reviewed research will be substantially and irreparably impaired. Academic publishing relies on professional credibility, ethical standing, and trust within editorial and review boards. A public censure questioning Dr. Darrow’s professional integrity would foreclose publication opportunities in a manner that cannot be quantified or later repaired, thereby silencing Dr. Darrow’s scientific contributions to his field.

102. ~~95.~~ *Fifth*, Dr. Darrow’s reputation-based professional consulting work will be irreparably harmed. For example, Dr. Darrow is a co-founder and principal of AudExperts, an international practice-consulting and professional education organization serving private

audiology and hearing healthcare practices. AudExperts' work is fundamentally based in trust and its clients engage the organization specifically because of Dr. Darrow's academic credibility, ethical standing, and recognized expertise.

103. ~~96.~~ *Sixth*, Dr. Darrow's professional credentials and teaching authority as a Certified Dementia Practitioner will be immediately and irreparably harmed. Dr. Darrow is an approved trainer of the Certified Dementia Practitioner (CDP) program through the National Organization of Certified Dementia Practitioners, a nationally recognized credentialing body. This role is selective, reputation-dependent, and grounded in professional trust, ethical standing, and subject- matter expertise, all of which will be irreversibly tarnished.

104. ~~97.~~ Dr. Darrow conservatively projects that the personal, professional, and commercial impact of a public censure will result in damages between $30 and 50 million over the next fifteen

(15) years. This figure includes personal losses related to Dr. Darrow's reputation, professional losses related to Dr. Darrow's university employment, and commercial losses of Dr. Darrow's business, AuDExperts.

105. ~~98.~~ In addition to Dr. Darrow's personal and professional injury, harm to multiple affiliated clinical organizations, professional partners, and independent practice owners who rely on Dr. Darrow's credibility, expertise, and public standing will occur. Dr. Darrow is associated with and serves as a public-facing spokesperson, author, educator, and clinical leader for numerous hearing healthcare entities and professionals, including more than sixty (60) independent private practices operating over two hundred thirty (230) locations nationwide, which utilize Dr. Darrow's name, expertise, and educational materials in connection with patient education and professional outreach.

106. ~~99.~~ The harm goes beyond Dr. Darrow. The public interest is served by allowing Dr.

Darrow to speak out about his research and advancements in the field of audiology, as well as the treatment of hearing loss and dementia prevention. Indeed, the public interest is contravened when the truth is silenced.

**COUNT I – DECLARATORY JUDGMENT**
**(ASHA)**

107. ~~100.~~ The previous paragraphs are incorporated by reference as if fully restated herein.

108. ~~101.~~ As described above, there is an actual, antagonistic and justiciable controversy between Dr. Darrow, on the one hand, and ASHA, on the other hand, concerning whether ASHA's Final Decision that the phrases "preventing dementia is possible" and "I teach people how to prevent cognitive decline and dementia" are misleading, thereby rendering Dr. Darrow's use thereof a violation of ASHA's Code of Ethics, was arbitrary and capricious.

109. ~~102.~~ There is a further actual, antagonistic, and justiciable controversy between Dr. Darrow, on the one hand, and ASHA, on the other hand, concerning whether ASHA, in rendering its Final Decision against Dr. Darrow, complied with its own Practices and Procedures or violated Dr. Darrow's due process rights and rights to fundamental fairness.

110. ~~103.~~ The antagonistic claims between the parties indicate that litigation is imminent and inevitable.

111. ~~104.~~ The determination sought by Dr. Darrow will terminate the controversy and uncertainty giving rise to this action.

WHEREFORE, Plaintiff, Keith N. Darrow, Ph.D., respectfully requests that this Court render judgment in his favor and against Defendant, American Speech-Language-Hearing Association, on Count I as follows:

a. Entry of an Order declaring ASHA's Board of Ethics decision against Plaintiff arbitrary and capricious;

b. Entry of an Order declaring ASHA violated its own Practices and Procedures in rendering the Final Decision against Plaintiff; and

c. Entry of an Order enjoining ASHA from issuing a public censure against Plaintiff; and

d. ~~c.~~ Entry of an Order granting Plaintiff such other and further relief as this Court deems appropriate.

**COUNT II – INJUNCTIVE RELIEF**
**(ASHA)**

112. ~~105.~~ The previous paragraphs are incorporated by reference as if fully restated herein.

113. ~~106.~~ The conclusions of the Board, including its proposed sanction, are arbitrary and capricious and the product of the Board's failure to adhere to applicable procedural requirements and, therefore, violative of Plaintiff's basic, but fundamental, due process rights.

114. ~~107.~~ Unless ASHA is enjoined by this Court from sanctioning Plaintiff by public censure, Plaintiff will suffer immediate, substantial, and irreparable injury including, but not limited to (~~1~~a) loss of his tenured faculty position at Worcester State University; (~~2~~b) immediate retraction of invitations for speaking engagements and foreclosure of future invitations; (~~3~~c) loss of status and credentials as an approved continuing education presenter for major professional organizations; (~~4~~d) loss of his ability to publish peer-reviewed research; and (~~5~~e) loss of reputation- based professional consulting work; and (~~6~~f) loss of his professional credentials and teaching authority as a Certified Dementia Practitioner through the National Organization of Certified Dementia Practitioners.

115. ~~108.~~ The benefits to Plaintiff obtaining an injunction outweigh the potential harm

ASHA would incur if the request for an injunction were granted. Indeed, ASHA would not be harmed at all. Only Plaintiff stands to lose anything.

116. ~~109.~~ The public interest is best served by granting the injunction.

WHEREFORE, Plaintiff, Keith N. Darrow, Ph.D., respectfully requests that this Court render judgment in his favor and against Defendant, American Speech-Language-Hearing Association, on Count II as follows:

a. Entry of an Order finding ASHA's Board of Ethics decision against Plaintiff arbitrary and capricious;

b. Entry of an Order finding ASHA violated its own Practices and Procedures in rendering the Final Decision against Plaintiff;

c. ~~b.~~ Entry of an Order enjoining ASHA from issuing a public censure against Plaintiff; and

d. ~~c.~~ Entry of an Order granting Plaintiff such other and further relief as this Court deems appropriate.

**COUNT III – TORTIOUS INTERFERENCE WITH ~~PROSPECTIVE ADVANTAGE~~ADVANTAGEOUS BUSINESS RELATIONSHIPS**
**(Cavitt)**

117. ~~110.~~ The previous paragraphs are incorporated by reference as if fully restated herein.

118. ~~111.~~ Beginning nearly a decade ago, Cavitt began making defamatory statements to Dr.

Darrow's colleagues in the audiology space, including conference attendees, potential and prospective collaborators, and professional contacts. In the years that followed, Dr. Darrow heard from many of these contacts, who expressed concern about continuing their business or affiliation with Dr. Darrow based on Cavitt's false and defamatory remarks about Dr. Darrow's personal character, ethics, and credentials.

~~112. Cavitt further took affirmative steps to remove Dr. Darrow from the leading Facebook group in the audiology community, Audiology Happy Hour, based on her desire silence the competition.~~

119. ~~113.~~ As alleged, these injurious falsehoods are not isolated, one-off occurrences. Rather, they exhibit a pattern of malice and bias designed to damage Dr. Darrow's reputation and professional relationships, which culminated in the defamatory Ethics Complaint that is the subject

of this action. Indeed, Cavitt admitted in the Ethics Complaint that she ~~had~~has " taken steps ~~to "protect~~, through professional associations and state licensure boards, to ensure that the public~~"~~ and audiologists are protected from [Dr. ~~Darrow.~~Darrow's] false promises, misinformation and misrepresentation of his credentials…"

120. At all times relevant hereto, Dr. Darrow maintained existing and prospective business relationships with numerous clients, collaborators, and partners in the audiology space including, but not limited to (a) private audiology practices that engaged or were likely to engage Dr. Darrow for consulting, training, and compliance services; (b) professional organizations, including, but not limited to, ASHA, the International Hearing Society, and the American Academy of Audiology, that invited or were likely to invite Dr. Darrow to present continuing education courses; (c) academic institutions or industry conferences that engaged or were likely engage Dr. Darrow as a speaker or presenter; and (d) publishers and peer-reviewed journalists that published or were likely to publish Dr. Darrow's research or scholarly work.

121. Dr. Darrow had a reasonable expectation that these relationships would continue and that prospective relationships would materialize absent Cavitt's tortious conduct.

122. ~~114.~~ Given the competitive overlap between Dr. Darrow and Cavitt's businesses, in combination with the long-running pattern of disparaging remarks directed at Dr. Darrow,

including the Ethics Complaint, ~~it~~Cavitt knew or should have known of Dr. Darrow's existing and prospective business relationships outlined above. It is clear that Cavitt's conduct and actions are related to her professional and business interests and geared toward eliminating a competitor.

123. ~~115.~~ The conduct of Cavitt in communicating her personal and professional "misgivings" to Dr. Darrow's business contacts and baselessly accusing Dr. Darrow of making false and misleading statements in the Ethics Complaint was intentional, willful, and calculated to cause damage to Dr. Darrow and ~~is~~his business endeavors.

124. ~~116.~~ Cavitt's conduct and actions were perpetrated with the intentional and improper purpose of causing damage to Dr. Darrow and without justifiable cause or purpose.

125. Cavitt intentionally interfered with Dr. Darrow's existing and prospective business relationships by: (a) making false defamatory statements to Dr. Darrow's colleagues, clients, and professional contacts; (b) removing Dr. Darrow from the Audiology Happy Hour Facebook group and posting other false and defamatory comments about him on social media; and (c) filing the false and defamatory Ethics Complaint with ASHA, which Cavitt knew or should have known would result in proceedings that could damage Dr. Darrow's professional reputation and business relationships.

126. ~~117.~~ As a direct and proximate result of the filing of the false and defamatory Ethics Complaint published by Cavitt, Dr. Darrow was subjected to ASHA's Board of Ethics proceedings, which resulted in an arbitrary and capricious finding against Dr. Darrow, thereby causing Dr. Darrow significant harm and injury, including the incurrence of attorneys' fees. Indeed, as a direct business competitor of Dr. Darrow, Cavitt stands to personally and financially benefit from the arbitrary and capricious finding of the BOE, as she will have effectively eliminated him from the market.

~~118. As a result of Cavitt's conduct and actions, Dr. Darrow has suffered and will continue to suffer loss of business opportunities, other consequential damages, including harm to his standing and reputation in the audiology community.~~

127. As a direct and proximate result of Cavitt's tortious interference, including the filing of the Ethics Complaint, Dr. Darrow has suffered and will continue to suffer pecuniary losses including, but not limited to: (a) loss of existing and prospective clients of Dr. Darrow and AuDExperts; (b) loss of speaking engagements and continuing education presentation opportunities; (c) damage to his professional reputation and standing in the audiology community; (d) loss of his tenured faculty position at Worcester State University and (e) other consequential damages.

WHEREFORE, Plaintiff, Keith N. Darrow, Ph.D., respectfully requests that this Court render judgment in his favor and against Defendant, Kim Cavitt, on Count ~~IV~~III, in an amount in excess of $75,000, including attorneys' fees.

Respectfully submitted,

/s/ *William M. Krulak, Jr.* William M. Kr
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202
(410) 727-6464
(410) 385-3700 (fax)
wkrulak@milesstockbridge.com
pftoohey@milesstockbridge.com

*Attorneys for Plaintiff,*
*Keith N. Darrow, Ph.D.*

**VERIFICATION**

I, Keith N. Darrow, Ph.D., solemnly affirm under the penalties of perjury that I have reviewed the foregoing Amended Verified Complaint and the allegations set forth therein are true to the best of my knowledge, information, and belief.

Keith N. Darrow, Ph.D., Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of June 2026, I caused a copy of the foregoing pleading, to be served via ECF filing to all counsel of record.

/s/ *William M. Krulak, Jr.*___________
William M. Krulak, Jr.

| **Summary report: Litera Compare for Word 11.14.0.42 Document comparison done on 6/18/2026 2:15:58 PM** | |
|---|---|
| **Style name:** Miles Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2026-01-30 - Verified Complaint (clean).pdf | |
| **Modified filename:** 2026-06-18 - Amended Verified Complaint (clean).pdf | |
| **Changes:** | |
| Add | 298 |
| ~~Delete~~ | 231 |
| ~~Move From~~ | 23 |
| Move To | 23 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 575 |